**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| BRITTANY GRAY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>THE CREDIT PROS INTERNATIONAL LLC,<br><br>Defendant. | Case No. 9:26-cv-80752<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Brittany Gray brings this Class Action Complaint against Defendant The Credit Pros International LLC ("Defendant"), individually and on behalf of all others similarly situated (collectively, "Class Members"), and alleges, upon personal knowledge as to Plaintiff's own actions and information and belief as to all other matters, as follows:

## INTRODUCTION

1. Plaintiff brings this class action against Defendant for its failure to secure and safeguard the personal identifiable information ("PII" or "Personal Information")[1] of its customers and/or employees, including, *inter alia*, their names, contact information, dates of birth, addresses, credit and debit card details, Social Security numbers, and bank account information.[2]

2. On or about June 16, 2026, Defendant experienced a data security incident when the notorious ransomware Icarus breached its cybersecurity systems, leading to the compromise

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[2] *See Cyber Incident Victim: The Credit Pros*, CYBER SEC. INCIDENT DATABASE, https://www.csidb.net/csidb/incidents/fe53a31b-5cd4-4799-a68e-7b54cfd45a4e/ (last visited June 23, 2026).

of Defendant's customers' and/or employees' Personal Information (the "Data Breach" or "Breach").[3]

3. Defendant owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. Defendant breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its customers' and/or employees' PII from unauthorized access and disclosure.

4. Defendant also owed a duty to notify Plaintiff and Class Members as soon as reasonably possible about the Data Breach.

5. Defendant failed to implement adequate cybersecurity measures, despite possessing the financial resources and technological means to do so. Its misconduct includes failing to detect and prevent the Data Breach, failing to encrypt sensitive data, failing to adequately notify affected individuals in a timely manner, and not taking necessary steps to safeguard data post-breach.

6. As a result of Defendant's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class Members' PII was accessed and disclosed. This action seeks to remedy Defendant's failures and their consequences. Plaintiff brings this action individually and on behalf of all United States residents whose PII was compromised in the Data Breach.

7. The Data Breach exposed Plaintiff and Class Members to significant risks, including identity theft, fraud, and other criminal activity. Plaintiff and Class Members now face

[3] *Id.*

the burdens of monitoring credit, financial accounts, and personal communications, as well as taking preventative measures, all of which require substantial time and money.

8. Plaintiff seeks a range of remedies to address both past and future harms, including compensation for financial losses, identity theft prevention services, enhanced data security protocols, and periodic audits to ensure compliance with cybersecurity standards.

9. Plaintiff, individually and on behalf of all other Class Members, asserts claims for negligence, breach of implied contract, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

10. Plaintiff Brittany Gray is, and at all times relevant, was a resident and citizen of the State of New Jersey.

11. Plaintiff has suffered actual injury from having her Personal Information exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including researching the Data Breach and monitoring her financial accounts for potential fraud and identity theft; (b) damages to and diminution of the value of her Personal Information, a form of intangible property that loses value when it falls into the hands of criminals; (c) loss of privacy; and (d) continuous imminent and impending injury arising from the increased risk of financial identity theft and fraud.

12. On information and belief, as a result of the Data Breach, Plaintiff Gray experienced actual fraud when an unauthorized party made a fraudulent purchase using Plaintiff's debit card, necessitating Plaintiff to contact her bank, have the fraudulent charge removed, and have a new debit card issued.

13. As a result of the Data Breach, Plaintiff Gray's sensitive Personal Information was compromised, and Plaintiff will continue to be at a substantial and certainly impending risk for fraud and identity theft, and their attendant damages, for years to come.

14. Defendant The Credit Pros International LLC is a Florida limited liability company with its principal place of business located at 7754 Okeechobee Blvd in West Palm Beach, Florida 33411.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiff and Defendant are citizens of different states, and there are over 100 putative Class Members.

16. This Court has personal jurisdiction over Defendant because it is organized and headquartered in Florida, regularly conduct business in Florida, and/or has sufficient minimum contacts in Florida.

17. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Defendant's Business

18. Defendant is a financial services company that provides credit repair, credit monitoring, and credit education services to consumers throughout the United States.

19. In the regular course of business, Defendant collects and maintains the PII of its employees and customers.

20. Plaintiff and Class Members provided their PII to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

21. Defendant was obligated, as a company that collects sensitive Personal Information, to protect that Information. Defendant is required by law to maintain the privacy and security of Plaintiff's and Class Members' Personal Information in its possession, custody, or control, and to provide Plaintiff and Class Members with notice if a breach occurs that may have compromised the privacy or security of that Information.

22. Defendant's duty required it to adopt reasonable measures to protect the Personal Information of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant had a legal duty to keep the sensitive Personal Information in its possession, custody, or control safe and confidential.

23. Defendant also had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), as well as industry standards, to keep Plaintiff's and Class Members' Personal Information confidential and to protect it from unauthorized access and disclosure.

24. Moreover, in Defendant's Privacy Policy, Defendant claims to "implement reasonable administrative, technical, and physical safeguards designed to protect the information [it] collect[s]."[4]

25. Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' Personal Information. Without having access to that sensitive Personal Information, Defendant would largely be unable to engage in its established business of providing financial services, nor would it be able to hire, onboard, and pay its employees.

---

[4] *Privacy Policy*, THE CREDIT PROS, https://privacy.cptn.co/privacy-policy/adec74a2-93ae-480c-9714-8e09ad1c7e23#data_security (last visited June 23, 2026).

26. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Personal Information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

**B. The Data Breach and Defendant's Failure to Prevent, Identify, and Timely Report It**

27. Upon information and belief, on June 16, 2026, unauthorized parties penetrated Defendant's cybersecurity systems, causing the Data Breach.[5] The notorious ransomware Icarus claimed responsibility for the Breach.[6]

28. The stolen information allegedly includes names, contact information, dates of birth, addresses, credit/debit card information, Social Security numbers and bank account information.[7]

29. While Defendant has sought to minimize the damage caused by the Data Breach, it cannot and has not denied that there was unauthorized access to the sensitive PII of Plaintiff and Class Members.

30. Because their data has already been leaked onto the dark web, Data Breach victims are, and remain, at risk that their data will be illegally used in the future.

31. The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures in order to protect its customers' and employees' PII.

32. Defendant breached its obligations and duties to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard

---

[5] *Cyber Incident Victim: The Credit Pros*, *supra* note 2.

[6] *Id.*

[7] *The Credit Pros Data Breach*, CLASS ACTION U (June 17, 2026), https://classactionu.org/current-data-breaches/the-credit-pros/.

its computer systems and data. Upon information and belief, Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect Plaintiff's and Class Members Personal Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

e. Failing to train its employees in the proper handling of emails containing Personal Information and maintain adequate email security practices;

f. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

g. Failing to adhere to industry standards for cybersecurity as discussed below; and

h. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' sensitive Personal Information.

33. Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Personal Information by allowing cybercriminals to access its computer network and systems which contained unsecured and unencrypted PII.

34. As a result, Plaintiff and Class Members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

**C. Defendant Acquires, Collects, and Stores Plaintiff's and Class Members' Personal Information**

35. Defendant derives a substantial economic benefit from its business of providing financial services, which requires that Defendant obtain, collect, store, and otherwise handle large amounts of PII.

36. By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties, and knew or should have known it was responsible for protecting that PII from unauthorized disclosure.

37. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII.

38. Moreover, Plaintiff and Class Members relied on Defendant to keep their Personal Information confidential and maintained securely, to use this Information for business purposes only, to provide the Information only to trusted and secure vendors and other third parties, and to make only authorized disclosures of this Information.

39. Defendant could have prevented this Data Breach by properly securing the Personal Information of Plaintiff and Class Members.

40. Defendant's negligence in safeguarding the Personal Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**D. Defendant Knew or Should Have Known of the Risk Because Companies in Possession of PII Are Particularly Susceptible to Cyberattacks**

41. Defendant's data security obligations were particularly important given the ubiquity of cyberattacks and/or data breaches targeting companies that collect and store Personal Information, like Defendant, preceding the date of the Data Breach.

42. Data thieves regularly target companies that receive and maintain PII due to the highly sensitive nature of that information. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

43. In light of past high profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), Advanced Info Service (8.3 billion records, May 2020), T-Mobile (77 million records, August 2021), Epik (15 million records, September 2021), AT&T (over 100 million records, March and July 2024), Ticketmaster (560 million records, May 2024), PowerSchool (62 million records, December 2024), Conduent (17 million records, January 2025), Aflac (23 million records, June 2025), Defendant knew or, if acting as a reasonable business, should have known that the Personal Information they collected and maintained would be vulnerable to and targeted by cybercriminals.

44. In 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[8]

45. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.[9]

---

[8] *2024 Data Breach Annual Report*, IDENTITY THEFT RES. CTR., https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited June 3, 2026).

[9] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited June 3, 2026).

46. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and Defendant.

47. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Personal Information of Plaintiff and Class Members from being compromised.

48. Additionally, individuals place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the figure is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[10]

49. Given these facts, any company that collects or utilizes Personal Information as part of its business operations and subsequently compromises the privacy or security of that Information, thereby deprives the affected individual of the full value of their transaction or employment with the company.

50. As a custodian of Personal Information, Defendant knew, or should have known, the importance of safeguarding the Personal Information entrusted to it, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

51. Defendant was, or should have been, fully aware of the unique type and the significant volume of Personal Information it collected and maintained and, thus, the significant number of individuals who would be harmed by the exposure of that Information.

---

[10] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*: *An Experimental Study*, INFO. SYS. RSCH. (June 2011), https://www.jstor.org/stable/23015560?seq=1.

52. Despite the prevalence of public announcements of data breach and data security compromises, as discussed *supra*, Defendant failed to take appropriate steps to protect the Personal Information of Plaintiff and Class Members from being compromised.

53. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for Plaintiff's and Class Members' Personal Information.

54. The ramifications of Defendant's failure to keep secure the Personal Information of Plaintiff and Class Members are long-lasting and severe. Once Personal Information is stolen, fraudulent use of that Information and damage to victims may continue for years.

**E. Value of Sensitive Personal Information**

55. PII is a valuable property right.[11] The value of PII as a commodity is measurable.[12] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[13] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[14] More recently, the "global data broker market size" was

[11] Marc van Lieshout, *The Value of Personal Data*, RESEARCHGATE (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data, ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible[.]").

[12] Robert Lowes, *Stolen EHR Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

[13] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[14] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

approximately $278 billion, and, by 2033, is projected to be over $500 billion.[15] PII is so valuable to identity thieves that once it has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

56. As a result of the real and significant value of these data, identity thieves and other cybercriminals have openly posted credit card numbers, Social Security numbers, bank account information, and other sensitive information directly on various internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

57. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[16] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[17]

58. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity

---

[15] Data Broker Market (2025-2033): Report Summary, GRAND VIEW RSCH., https://www.grandviewresearch.com/industry-analysis/data-broker-market-report (last visited June 3, 2026).

[16] 17 C.F.R. § 248.201 (2016).

[17] *Id.*

credentials.[18]

59. For example, PII can be sold at a price ranging from $40 to $200.[19] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[20]

60. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, Plaintiff services, and housing, or even give false information to police.

61. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[21]

**F. Defendant Failed to Comply with FTC Guidelines**

62. Data breaches are preventable.[22] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "In almost all cases, the data breaches that occurred could have

---

[18] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[19] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, EXPERIAN (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[20] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited June 3, 2026).

[21] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extend Is Unknown*, U.S. GOV'T ACCOUNTABILITY OFF. (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

[22] Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.

been prevented by proper planning and the correct design and implementation of appropriate security solutions."[23] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[24]

63. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[25]

64. In a data breach like this, many failures laid the groundwork for the Breach.

65. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

66. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand its network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone

[23] *Id.* at 17.

[24] *Id.* at 28.

[25] *Id.*

is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

67. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

68. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet its data security obligations.

69. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices, and those of its vendors. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

70. Defendant was at all times fully aware of its obligation to protect the PII they were entrusted with yet failed to comply with such obligation. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**G. Defendant Failed to Comply with Industry Standards**

71. As discussed *supra*, experts studying cybersecurity routinely identify companies like Defendant as being particularly vulnerable to cyberattacks because of the value of the Personal

Information which they collect and maintain.

72. Some industry best practices that should be implemented by companies dealing with sensitive PII, like Defendant, include, but are not limited to: educating all employees; strong password requirements; multilayer security, including firewalls; anti-virus and anti-malware software; encryption; multi-factor authentication; backing up data; and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all these industry best practices.

73. Other best cybersecurity practices that are standard at large companies that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

74. Defendant failed to meet the minimum standards of, e.g., the NIST Cybersecurity Framework, and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established industry standards in reasonable cybersecurity readiness.

75. Defendant also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

76. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[26]

77. To prevent the Data Breach, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

[26] *See How to Protect Your Networks from RANSOMWARE*, at 3, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited June 23, 2026).

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[27]

78. Further, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender

[27] *Id.* at 3-4.

directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[28]

79. In addition, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise.

- **Include IT Pros in security discussions**
  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely.

- **Build credential hygiene**
  - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least privilege**
  - Monitor for adversarial activities

[28] *See* Protecting Against Ransomware, CYBERSEC. & INFRASTRUCTURE SEC. AGENCY (rev. Sept. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware (last visited June 3, 2026).

- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

- **Harden infrastructure**
  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[29]

80. Given that Defendant was storing the PII of thousands of individuals, Defendant could have and should have implemented all of the above measures to prevent and detect cyberattacks.

81. These foregoing frameworks are existing and applicable industry standards in the corporate sector and Defendant failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

82. Despite Defendant's obligations, Defendant failed to appropriately monitor and maintain its data security systems in a meaningful way so as to prevent the Data Breach.

83. In sum, had Defendant properly maintained its systems and adequately protected them, it could have prevented the Data Breach.

**H. Defendant Breached Duties to Safeguard PII**

84. In addition to its obligations under federal laws, Defendant owed duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal Information in its possession from being compromised, lost,

[29] *See Human-Operated Ransomware Attacks: A Preventable Disaster*, MICROSOFT (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

stolen, accessed, and misused by unauthorized persons. Defendant owed duties to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Personal Information in its possession, custody, or control.

85. Defendant owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of the Personal Information in Defendant's possession, custody, or control in a timely manner.

86. Defendant owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

87. Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of Defendant's inadequate data security practices.

88. Defendant breached obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because Defendant failed to properly maintain and safeguard its computer systems and data, and failed to audit, monitor, or ensure the integrity of its data security practices. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect customers', employees', and other related individuals' PII;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

e. Failing to adhere to industry standards for cybersecurity as discussed above; and

f. Otherwise breaching duties and obligations to protect Plaintiff's and Class Members' PII.

89. Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted PII.

90. Had Defendant remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendant could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

**I. Common Injuries and Damages**

91. As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of the value of their PII; and (e) the continued risk to their PII, which remains in the possession of Defendant and which is subject to further breaches, so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

**1. *The Data Breach Increases Victims' Risk of Identity Theft***

92. Due to the Data Breach, Plaintiff and Class Members are at an indefinite,

heightened risk of identity theft.

93. According to reports, the unencrypted PII of Class Members has already been leaked onto the dark web. In addition, their unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members.

94. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft-related crimes discussed below.

95. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

96. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's log-in credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

97. One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[30]

[30] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and

98. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

99. The development of "Fullz" packages means that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, driver's license numbers, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

100. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that approximately 39% of victims of identity misuse needed a month or more to resolve issues stemming from identity theft.[31]

101. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately

---

more. As a rule of thumb, the more information you have on a victim, the more money can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, KREBSONSECURITY (Sept. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

[31] *2025 Consumer Impact Report*, IDENTITY THEFT RES. CTR. (2025) at 27, https://www.idtheftcenter.org/wp-content/uploads/2025/10/The-2025-ITRC-Consumer-Impact-Report.pdf (last visited June 3, 2026).

three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[32]

102. It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### 2. *Loss of Time to Mitigate Risk of Identity Theft and Fraud*

103. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

104. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

105. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches in which it noted that victims of identity theft

[32] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9, 12 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

will face "substantial costs and time to repair the damage to their good name and credit record."[33]

106. These efforts are also consistent with the steps the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[34]

### 3. *Diminution of Value of PII*

107. PII is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyberthefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond a doubt that PII has considerable market value.

108. An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[35]

109. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[36]

110. Consumers who agree to provide their web browsing history to the Nielsen

---

[33] *See Data Breaches Are Frequent . . .*, *supra* note 21.
[34] *What To Do Right Away,* FED. TRADE COMM'N, https://www.identitytheft.gov/Steps (last visited June 3, 2026).
[35] David Lazarus, *Shadowy Data Brokers Make the Most of Their Cloak,* L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[36] DATACOUP, INC., https://datacoup.com/ (last visited June 3, 2026).

Corporation can receive up to $60.00 per year.[37]

111. As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

#### 4. *Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary*

112. Given the type of targeted attack in this case and sophisticated criminal activity, the type of PII involved, and the likely volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchased by criminals intending to utilize the PII for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

113. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

114. Consequently, Plaintiff and Class Members are at a present and continuous risk of

---

[37] *See Frequently Asked Questions*, NIELSEN COMP. & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited June 3, 2026).

fraud and identity theft for many years into the future.

115. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost, for a minimum of five years, that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

**5. *Lost Benefit of the Bargain***

116. Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

117. When agreeing to provide their Personal Information, which was a condition precedent to receive services and/or employment from Defendant, Plaintiff and Class Members, understood and expected that they were, in part, paying for services or receiving lesser wages, in exchange for data security to protect the Personal Information they were required to provide.

118. Plaintiff values data security. Indeed, data security is an important consideration for seeking any services.

119. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[38] Therein, Cisco reported the following:

> For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data.[39]

[38] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited June 3, 2026).

[39] *Id*. at 3.

120. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[40] 89% of consumers stated that "I care about data privacy."[41] 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[42]

121. Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

**CLASS ALLEGATIONS**

122. Pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks certification of the following Nationwide Class:

> All individuals residing in the United States whose PII was accessed, acquired, and/or exfiltrated as a result of the Data Breach.

123. Excluded from the Class are: (1) Defendant, its subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and their current or former officers and directors; (2) the judges presiding over this action and members of their immediate families and their staff; and (3) all individuals who make a timely election to be excluded from this proceeding using the correct opt-out protocol.

124. Plaintiff reserves the right to amend the definition of the Class or add additional Classes or Subclasses if further information and discovery indicate that the Class Definition, as plead, should be narrowed, expanded, or otherwise modified.

---

[40] *Id*.

[41] *Id*. at 9.

[42] *Id*.

125. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of those claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

126. Numerosity. The members in the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. Upon information and belief, the Data Breach involved the Personal Information of tens of thousands of individuals.

127. Commonality. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually and on behalf of all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action. Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class Members' PII from unauthorized access and disclosure;

b. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class Members' PII;

c. Whether an implied contract existed between Class Members and Defendant providing that Defendant would implement and maintain reasonable security measures to protect and secure Plaintiff's and Class Members' PII from unauthorized access and disclosure;

d. Whether Defendant breached its duties to protect Plaintiff's and Class Members' PII; and

e. Whether Plaintiff and all other Class Members are entitled to damages and the measure of such damages and relief.

128. Typicality. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had PII compromised in the Data Breach. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

129. Adequacy. Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff is an adequate representative of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

130. Superiority and Manageability. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress from Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

131. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

132. Defendant collected the Personal Information of Plaintiff and Class Members in the ordinary course of providing services and/or employment to Plaintiff and Class Members.

133. Defendant owed a duty to Plaintiff and all other Class Members to exercise reasonable care in safeguarding and protecting their Personal Information in Defendant's possession, custody, or control. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach. Defendant's duties arose under common law and FTC guidance.

134. Defendant knew the risks of collecting and storing Plaintiff's and all other Class Members' PII and the importance of maintaining secure systems. Defendant knew of the many data breaches that targeted companies that collect PII in recent years.

135. Defendant also acknowledged the importance of protecting the PII of Plaintiff and Class Members, as reflected in its Privacy Policy, where it states that it "implement[s] reasonable administrative, technical, and physical safeguards designed to protect the information [it] collect[s]."[43]

136. Given the nature of Defendant's business, the sensitivity and value of the PII they maintain, and the resources at its disposal, Defendant should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

---

[43] *Privacy Policy*, *supra* note 4.

137. Defendant breached its duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to them—including Plaintiff's and Class Members' PII.

138. It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

139. But for Defendant's negligent conduct or breach of the above-described duties owed to Plaintiff and Class Members, their PII would not have been compromised.

140. Defendant's duties also arise from Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to employ reasonable measures to protect and secure PII.

141. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and all other Class Members' PII and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiff and the other Class Members.

142. Defendant's violation of Section 5 of the FTCA constitutes negligence per se.

143. Plaintiff and Class Members are within the class of persons Section 5 of the FTC Act was intended to protect.

144. The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and all other Class Members as a result of the Data Breach.

145. It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

146. As a result of Defendant's above-described wrongful actions, inaction, want of ordinary care, and violations of Section 5 of the FTC Act, all of which directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money

that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**

147. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

148. In connection with receiving services, and/or employment from Defendant, Plaintiff and all other Class Members entered into implied contracts with Defendant.

149. Pursuant to these implied contracts, Plaintiff and Class Members paid money to Defendant, whether directly or indirectly, and provided Defendant with their PII. In exchange, Defendant agreed to, among other things, and Plaintiff and Class Members understood that Defendant would: (1) provide services and/or employment to Plaintiff and Class Members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' PII; and (3) protect Plaintiff's and Class Members' PII in compliance with federal and state laws and regulations and industry standards.

150. The protection of PII was a material term of the implied contracts between Plaintiff and Class Members, on the one hand, and Defendant, on the other hand. Had Plaintiff and Class Members known that Defendant would not adequately protect their PII, they would not have provided Defendant with their PII and/or obtained services or employment from Defendant.

151. Plaintiff and Class Members performed their obligations under the implied contract when they provided Defendant with their PII and paid—directly or indirectly—for services from Defendant.

152. Defendant breached its obligations under its implied contracts with Plaintiff and Class Members in failing to implement and maintain reasonable security measures to protect and

secure their PII and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class Members' PII in a manner that complies with applicable laws, regulations, and industry standards.

153. Defendant's breach of its obligations of its implied contracts with Plaintiff and Class Members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class Members have suffered from the Data Breach.

154. Plaintiff and all other Class Members were damaged by Defendant's breach of implied contracts because: (i) they paid—directly or indirectly—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft—a risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; and/or (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

## COUNT III
## UNJUST ENRICHMENT

155. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

156. This claim is pleaded in the alternative to the breach of implied contract claim.

157. Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of monies paid for services and/or employment from Defendant.

158. Defendant accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Defendant also benefitted from the receipt of Plaintiff's and Class Members'

PII, as this information was used to facilitate employment and/or payment for Defendant's services.

159. As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

160. Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to adequately implement the data privacy and security procedures that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

161. Defendant should be compelled to provide, for the benefit of Plaintiff and Class Members, all unlawful proceeds received by it as a result of its misconduct and the Data Breach.

## COUNT IV
## DECLARATORY RELIEF

162. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

163. The Declaratory Judgments Act, 28 U.S.C. §§ 2201, *et seq.* authorizes courts to declare rights, status, and other legal relations so as to afford litigants relief from uncertainty and insecurity.

164. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective duties to reasonably safeguard Plaintiff's and Class Members' PII, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from future data breaches that compromise their PII.

165. The Data Breach evidences Defendant's failure to provide security measures that were adequate, reasonable, and/or compliant with industry standards and best practices with regard to safeguarding Plaintiff's and Class Members' PII.

166. The Data Breach, and Defendant's response to the Data Breach, demonstrates that its systems remain vulnerable to unauthorized access, and more stringent measures must be taken to safeguard the PII of Plaintiff and the Class Members going forward.

167. Plaintiff seeks a declaration that Defendant's current security measures are inadequate to safeguard PII, do not comply with its obligations to keep PII secure, and that Defendant must implement specific additional security practices to provide reasonable protection and security for the PII they maintain, including the PII of Plaintiff and Class Members.

**PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as the Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, individually and on behalf of the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Respectfully submitted,

Date: June 23, 2026

*/s/ Robert R. Jimenez*
Robert R. Jimenez (FBN 72020)
**BRYSON HARRIS SUCIU & DEMAY PLLC**
201 Sevilla Avenue, Suite 200
Miami, Florida 33134
Telephone: (786) 206-7896
rjimenez@brysonpllc.com;

Andrew W. Ferich (*pro hac vice* forthcoming)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
aferich@ahdootwolfson.com

*Attorney for Plaintiff and the Proposed Class*